May it please the Court. The petitioner in this case was brutally tortured by the Ethiopian military because of his ethnicity, family membership, and impudent political opinion, all protected grounds under asylum law. Now, the BIA nonetheless found the petitioner ineligible for asylum. This was wrong for three independent reasons. First, the Singh decision we cite in our briefs demonstrates that persecution on account of a... What decision? The Singh decision, it was the Ninth Circuit decision, demonstrates that persecution on account of a false belief that the victim was a member of a separatist group is persecution on account of impudent political opinion. Now, somewhat curiously, the government didn't even cite the Singh decision or even necessarily rebut this argument in its brief, so it's unclear if they're forfeiting this point or not. Now, the second reason the IJ in this case legally erred is he ignored the underlying motivations behind the torture of the petitioner. The IJ said that the petitioner was tortured because the military believed he was a supporter of the ONLF. But the only reason the military thought he was a supporter of the ONLF was because of his ethnicity. And you can't immunize persecution through the use of a discriminatory ethnic stereotype. When you do that, the central motivation behind the persecution is that ethnic stereotype, which is a protected ground under asylum law. And the third and final reason is the BIA erred when it failed to analyze the matter of SP factors and erred when it failed to conclude that the Ethiopian soldiers tortured the petitioner based on  JUSTICE SCALIA. Your problem in this case, though, is the standard of review. I'm sure you know that. MR. ZUCKERBERG. Yes, Your Honor. And we agree it's a problem for our third reason, which is a factual challenge. I submit that the first two are actually legal errors. The BIA and the IJ ignored controlling the law. It's actually not a factual error. We accept the factual conclusion of the BIA. And those were two. The first factual conclusion was the reason the petitioner- MR. BOUTROUS. I'm sorry. If you could just ignore binding law, you're not referring to the Ninth Circuit's Singh decision. MR. ZUCKERBERG. No, Your Honor. MR. BOUTROUS. Are you referring to the matter of SP? MR. ZUCKERBERG. No, Your Honor. I'm actually referring to just the statute itself. We think that it misapplied the basic statute. And the reason for that is we don't disagree with any of the factual findings made by the IJ. And those were two in particular. One, that the soldiers tortured the petitioner because they suspected he was a member of the ONLF. And two, was the credited testimony of the petitioner. But the reason for that suspicion was because he was an Ogden. Now, the IJ took those two facts and came to- MR. BOUTROUS. You know, the fact that I picked up was, and this is what the IJ said, said the government took action against him only because it was attempting to suppress the financial supporter of ONLF, and they believed his father was, and they believed that the petitioner knew supporters who he could reveal to the government. That's what I picked up  MR. ZUCKERBERG. Absolutely, Your Honor. But the question is whether that finding is a determination of what the central motivation was. MR. BOUTROUS. You said it only. MR. ZUCKERBERG. Well, then, Your Honor, I think the IJ opinion is internally contradictory. Because if you look at it, it does credit the testimony of the petitioner that the reason for that suspicion was his ethnicity. The only way you can essentially harmonize those two independent findings, that, A, he was tortured because he was suspected of being a member of ONLF, which is what Your Honor just said. MR. BOUTROUS. Is that actually in the finding, he was suspected of- MR. ZUCKERBERG. Well, it was an oral opinion. But, yes, I believe the IJ said, the actual quote here, from the BIA opinion, the immigration judge concluded that the harm the investigation. But that's not enough under central motivation. You still have to figure out why that suspicion occurred. MR. BOUTROUS. I didn't see where they really were arrested him because they thought he was a member. I didn't see that in the IJ's opinion. MR. ZUCKERBERG. Well, Your Honor, it is in the credited testimony of the petitioner. For example, the petitioner testified that everyone in that region is suspected of being a member of the ONLF, and everyone in that region is an Ogden. So the only reason that suspicion ever occurred in the first place was because of his ethnicity. Now, if you look at the BIA- MR. BOUTROUS. Would this be a correct way for me to think about it? There may be substantial evidence to support the finding that one central reason was supporter of terrorism. But the issue before us is whether or not the finding that it was the only reason. MR. ZUCKERBERG. Correct. MR. BOUTROUS. You're saying that if you look at the record and you look at the IJ's credibility findings, and in fact it requires, would compel any reasonable juror to find that it was because of family persecution, ethnicity, or – those are three different baskets. MR. ZUCKERBERG. Absolutely. MR. BOUTROUS. The one that seemed maybe strongest to me was more family. If fathers distrusted, uncles distrusted, grandfathers distrusted enough to kill them all, then they extend the distrust to the child. MR. ZUCKERBERG. Absolutely, Your Honor. Family. MR. BOUTROUS. But the difference is, but they never went after the child until he opened the store again. What's the thought on that? MR. ZUCKERBERG. Well, I think it's important to basically distinguish between one causation and motivation. There might be many reasons why persecution happened, but asylum eligibility turns on the persecutor's motivations. Take an example. MR. BOUTROUS. Were the issue before – I mean, it is Kafkaesque. We have to decide what was in this torturer's mind. That's really what we're doing legally. MR. ZUCKERBERG. Yes, Your Honor. It is, unfortunately, that we're from asylum law. MR. BOUTROUS. We can't torture another person. MR. ZUCKERBERG. Right. And in this case, what we have is an absolute credibility determination by the I.J., which is not uncommon, but it's not common either. The I.J. credited his testimony, but the reason for the suspicion is because of his ethnicity and his family membership. Now, to take Your Honor's question – MR. BOUTROUS. I mean, is that based on just his general statement that he accredited the testimony? MR. ZUCKERBERG. I'm sorry, Your Honor? MR. BOUTROUS. Did he make a finding that he accepted that particular testimony? MR. ZUCKERBERG. He made a broad credibility determination, Your Honor, but there's actually no distinguishing in the I.J. opinion on specific facts. That could be something on remand that he could determine. MR. BOUTROUS. I mean, that's the petitioner saying why he thought he was being persecuted, right? MR. ZUCKERBERG. Yes, Your Honor, but it was also based on corroborating evidence in the record. For example, evidence was submitted based on NGO reports and stuff like that, which support the idea that the Ethiopian military is targeting Ogaden in this region. MR. BOUTROUS. Do you have any circuit precedent there where we would remand to do just what you said, which is you've got to particularize more, you've got to go through the S.P. factors? What would be the best case that would support just a remand? MR. ZUCKERBERG. There actually wouldn't be on the S.P. factors, but on the first two, which is essentially you fail to consider senatorial motivation, we actually don't think remand's necessary. MR. BOUTROUS. I know you say that, but let's say — MR. ZUCKERBERG. That's unclear. Well, Your Honor, I'm actually not aware of any circuit precedent on that. However, it would be the basic principle that the I.J.'s opinion can't be supported by the record. However, there's a legal error, so you remand with instructions correcting the legal error, and for them to then apply the facts of a new restriction  MR. BOUTROUS. Yeah. MR. ZUCKERBERG. I actually want to go back a bit to the question Your Honor asked about whether they showed up because of the store. To take a better example, a petitioner might not have been tortured at all if the soldiers hadn't been operating in his neighborhood. So in one sense, petitioner's residence in that neighborhood was one reason for his persecution. But no court would say that the petitioner's persecution was on account of his neighborhood or that that was the sole reason. Instead, asylum eligibility turns on whether something else was a central motivation, whether after the soldiers encountered the petitioner, because they were there for the store, they were motivated by protected ground, be it his family membership, ethnicity, or imputed political opinion, to then persecute and torture him. Now, the government seems to make two different arguments on what I like to call our underlying motives argument. One is essentially a legal argument. The government says, and I quote from their brief here on page 22 of the brief, even assuming that the Ethiopian government suspected every Ogaden, and only Ogaden, of supporting the ONLF, the harm the petitioner suffered will still not be on account of any protected characteristic as a matter of law. But a blanket rule like that ignores a central motivation standard completely. And it would allow foreign governments to persecute individuals of impunity so long as they put essentially a veneer of investigation behind their ethnic stereotype. I'll take a more tongue example. If ISIS baselessly declared that every single Christian in their territory was against their government, which they have, then it makes it no less persecution on protected ground because they have that ostensible purpose. They are still targeting these individuals, making that decision based on a protected ground. Yeah, but going after a terrorist organization is different than going after Christians, isn't it? Yes, Your Honor. And to be clear, if there is any evidence whatsoever that this individual was a terrorist or was any danger, the government has a bar to prevent it from doing so. The issue is, when you make that determination that every one of us, particular ethnicity, of a particular family, of a particular political opinion, is a terrorist, you are making that terrorism determination based on a protected ground. In this case, for example, if the government believes that all Ogaden are members of the ONLF, and therefore, as part of their terrorism investigation, they're going to investigate all Ogaden and torture the petitioner for that reason, then he's being tortured on account of that protected ground. Because the one thing you haven't mentioned, because it seems to cut against you, is the reopening and operation of the grocery store. Yes, Your Honor. Well, I think the issue with the store is, again, there's two reasons why it actually doesn't matter here. One is, there's actually no finding in the record here that the suspicion of being a member of the ONLF was based on the store. In fact, to the extent there's any record evidence, because this issue really wasn't presenting this argument that the government is now making, to the extent there's any record evidence, it's reports in the record that say that the store only affected what type of support the petitioner was accused of giving, not the fact that he was giving support. There is no evidence that the Ethiopian military is going around torturing store owners writ large. No, no. They're targeting store owners who are Ogaden. And the report says, for example, as one of the— Maybe targeting anyone who's giving the kind of support that the grocery store was giving, I suppose. You mean financial support, Your Honor? Any kind of financial support, or filtering supplies through the store, or whatever. There's no finding to that effect. But even if there were, that would be one reason for persecution. But it would not ignore the fact that the IJ found that the reason for persecution was membership in ONLF. And at no point—I'm not sure the government has actually argued this either—has there been a tie to store ownership and membership or support of ONLF. It's the method, not the reason, why someone might be suspected of being an ONLF member. Between being accused of being a member and being accused of providing support? We're not drawing that distinction, Your Honor. Supporting a terrorist organization is the We're not saying that there's any distinction between those two. What we're saying is, having a store and having money might be one fact—that might be where the money comes from. But it doesn't establish that store owners are ONLF supporters. The BIA cites just this MAS decision in its one sentence of, well, here's the reason he was persecuted. It's investigating terrorism. Correct. And I think your point is, if that's all it takes, that's a whitewash, you'll never get asylum. Correct, Your Honor. So, where do we look to for when you've got a legitimate investigating terrorism versus an illegitimate one? Is there a case that spells that distinction out? Actually, Your Honor, none that we've found and none that the government has cited other than possibly Ozdemir, except we think that is fairly distinguishable because there you had what this case does not have. You had an explicit finding that the reason for persecution was not ethnicity. If the IJ had said that in this case, if the IJ had said, look, I realize you're testifying that they suspect every Ogden of being a member of the ONLF. Nonetheless, I'm making a finding that the reason you were tortured was not this. That would be a very different case. And that's what Ozdemir was. The judge says— Do the ESP factors spell it out better than MAS? Or what's the—let me rephrase it. What—is there error in the BIA's citation to MAS? What's your thought about MAS? Yes, Your Honor, there is. MAS is inapplicable to this case because there was a reasonable investigation of terrorism, and there was no finding that ethnicity was the basis for that suspicion. It's similar to all the cases. In fact, that's— You say there was a reasonable investigation, and I use the word legitimate. Is that required? Do these investigations have to be legitimate? Not necessarily, Your Honor. And this actually goes to our second argument, which is the if it ends up being false, that is, persecution based on imputed political opinion. It's actually a somewhat different argument that— That's the Ninth Circuit, and that's a little further than we've gone. But I see a slightly different twist here. Assume they can be wrong in their investigation. Yes, Your Honor. What they can't do is torture. How would we ever want to give that—do any of these investigative terrorism cases involve torture and compelling someone to then go back and be a spy? How would we ever characterize that as a legitimate investigation? We wouldn't. That's actually—that is the matter of SP factors, at the point where prosecution becomes persecution. And if you look at the factors there, there are five different factors which we briefed fully before the BIA, but the BIA did not discuss whatsoever. And we run through all the various— That error itself? That's error as well. It's a separate error. Is that in one, two, or three, or is that four? That's actually three, Your Honor. That's three. Yes. Okay. In that case— What does legitimate investigation mean, though? Does that mean where there's no arguable grounds to be investigating this man for terrorism, or does it mean using threats or using torture? Well, I think there are many ways it could be illegitimate. And the one that I would highlight here, because it's relevant for us, is that if it's based on something that's not a protected characteristic, then asylum eligibility would not be in play. In this case, however, the basis for the investigation, the basis for the suspicion, the basis for the torture was his ethnicity and family membership and his imputed political opinion. If it was for any other reason—see, my time's expired. If it was for any other reason, that would essentially break the causal link, and he would not have a claim that his torturers were centrally motivated by protected ground. But if you accept the factual finding that it was only because of his investigation of terrorist activities, does that end the case? No, Your Honor, I don't think it does, because I think that's half the finding. Pardon? I think that's only half the finding. It's finding that we're going to investigate you because we think you're a member of a bad group. Well, why do you think you're a member of that bad group? Well, because of protected ground. And that's what causes asylum eligibility. Thank you, sir. You have a good time. All right. Mr. Petty? May it please the Court? The Court should deny the petition for review in this case because the record is replete with evidence that the petitioner was singled out because of his suspected conduct and not because of who he was. He wrote that his father was first important because both the petitioner and his cousin explained that the reason for the suspicion was because of the grocery store. The IJ found that it was because of the grocery store. And after the petitioner reopened his father's store, the same accusations that were leveled at his father were leveled at him. So what's the significance of the grocery store? First, the petitioner's own evidence shows that government security forces target quote market traders and quote business leaders because they believe these groups may be supporting the ONLF. Second, the petitioner's other evidence shows that ONLF fighters obtain provisions from civilian supporters in towns and villages. And the petitioner's cousin described this particular store as in the town. The petitioner was not harmed or threatened during the ten months when the store was closed, as your Honor pointed out, and it was only after he was arrested that he was found guilty. And the petitioner's cousin described this particular store as in the town. But on that theory, any working shop in this region would then allow persecution of that shop owner because they could be sort of passive tense support could be supporting the terrorism. The record doesn't I guess let me ask you this way. Do you have any record evidence that shows that this boy was alleged to be channeling money to this boy, not the father, was channeling money? Is there anything in the record to support that? No. Is there anything in the record to support your brief statement that the business was successful when he was running it? That the business was successful during the month that he was operating it? Not his father. No, that pertains to the prior time when the father was operating it. Okay, but see that all suggests to me that the reason they persecuted him was because of the father. And then you're in the world of a protected category. The father runs the store and there's direct evidence in the record that he, whatever, the customers gave him money, he gave it to the terrorism. So thereafter him, they kill him. His brother asks about him, he gets killed. The father asks about him, he gets killed or disappeared, whatever happened to him. The boy reopens the store. I didn't see evidence that it was quote successful at that point. I didn't see any evidence that he was then, there was suggestion he was. It was all passive tense, well any store would help at that point. So the connection has to be through the family. And they just want to kill all males in the family. Well, Your Honor, I think it's important to distinguish what happened to the uncle and the grandfather because that was factually distinct. The maternal uncle refused to fight in the Ethiopian army and he was detained and then later killed. The maternal grandfather went to the authorities to find out what happened to his son, the maternal uncle, and then he was detained. That's separate and completely apart from the story. But it's interesting because the record shows that the only reason this young man was released was because he made the opposite decision than his uncle. He lies to them and says, I will go spy for you. And then he gets out of there. So again, to me, it relates directly to what he'd learned about the family. I don't know that the record. I thought it was credited that the only reason he gets out is because he says I'll spy. He does. That's correct. Well, his uncle made the opposite decision and was killed. Do we know that? That the uncle made the opposite decision? We, I don't believe we know that the uncle made that decision. He may have been killed before he was given a chance. He may not have been given a chance. I thought the record was clear. He's the teacher. He goes in and says, I will not assist. The, the boy in this case, the, but the uncle was asked to join the army, which is something quite different than spying on neighbors. Well, if it's different, it would seem to me to be problematic for the government here because when I read all the investigation cases, and I agree they deserve deference, Oz Camere Perez in re SP, every single one of those, you have an individual that's persecuted that is much closer to the terrorism. He's in the military bunker when he's found he's at the pro Curtis demonstration. So on that one, and then when you look at what the persecution is, it really is government's getting information foot beating and all that, not none. Is there any legitimate investigation where we, the courts say that's a legitimate terrorism investigation that justifies this persecution that involved killing every adult male in the family and telling a person you get out if you spy? How do we, how do we ever write that that's a legitimate government investigation? I'm not sure how to answer that question, Your Honor, but I think what we need, here's the way you can answer it. Do do the facts of this case approximate any legitimate government investigation case that you can cite to me with respect, with respect to the searching for information tactics here, killing and torture credited past tense plus future. The IJ said, if he comes back anywhere in Ethiopia, he will be tortured again. Do you have any case where we say the persecution is permissible because it's in meaningful part for a government of legitimate government investigation where we had that level of searching for information? No. Okay. But I think there's, there's a distinction that needs to be drawn here between torture convention protection, which he received and persecution, which leads to asylum, which is what we're discussing today. And for the, for asylum to be, for the person to be eligible for asylum, the conduct has to be on account of one of the protected grounds. He's alleged ethnicity, which falls under a particular social group or his family, which, which I suppose as well. Um, the tactics are a different issue and I'm not defending the Ethiopian government. The only reason he was persecuted was for a legitimate investigation. If the this, if the IJ made that factual finding, but everyone agrees it was not a legitimate investigation case, torture and forcing someone to be a spy, then that discredits the only reason found. And the record is replete with another central meaningful part could be that he's the son of the guy who was suspected of supporting. Your Honor, when you say not legitimate, do you mean that it's pretextual or do you mean that the tactics are unacceptable in civilized society? I mean every case that I could possibly read had searching for information, government investigation at worst beating feet. I couldn't find a case where, Oh, the department, the U S government is telling us defer to them for investigative in detention. When the investigative means involve killing people, the means don't go to the, um, intent and the intent has to be to harm someone on account of their membership in the particular social group. We are negative part, but the positive part is this IJ said the only reason they did what they did was for a legitimate government investigation. I have a real problem with that. If it were me, I would say the SP factors would tell us, was it legitimate or not? Okay. You see where I am? Yes, Your Honor. I think, um, well first with respect to SP, uh, the government's position is that SP has been superseded by statute. SP is a pre real idea act case. Um, and the committee report to the real idea act specifically intended to raise the bar where terrorism is concerned. This is in footnote nine in matter of JVN and SM. Uh, it has a citation to the committee report, um, from the house of representatives. What does, what does the act say that would raise the bar above this case? Well, the real idea act does apply to this case. All right. Matter of SP applied an earlier standard where it was just a central reason. What is it in the IDEA that takes this case out of the SP factors? What is it in the act? Yeah. They enacted the one central reason standard, which is a higher standard than had been, had been under and used previously. So now we have the one central reason standard allowing for mixed motives, but it's higher than what was used previously. I mean, does that say though, that, that, uh, it has to, it can't, it cannot be a legitimate investigation. It doesn't speak to the legitimacy. Why isn't that still in the law then? I'm sorry. Why doesn't a illegitimate investigation, uh, raise the flag of, of, uh, that, that wouldn't be contrary to what the real idea says. Yeah. The act doesn't speak to whether the investigation is pretextual or not. And there's no issue here about whether, I mean, we don't know whether the investigation was pretextual. The father may well have been funneling money to the ONLF. Is that all a legitimate investigation means is pretextual? Well, that I was trying to, to zero in on this with judge Higginson. I'm not sure that we're not still talking past each other, but I'm not talking best. I agree with your statement just now that probably under our deferential law, what they did to the father, we wouldn't touch. So then the only jump that I can see would, that suggests this boy is funneling money is that it's a quote successful business or that they actually don't round him up until it reopens. That's it. Until it reopens there, there, I, I believe there's something about that shop that the government was interested in and it may have been legitimate, it may have not been, but the court is now whether there's sufficient evidence in the record to find that any reasonable fact finder would have gone the other way. The immigration judge found that this was any reasonable fact finder wouldn't find that there could not be another meaningful reason, right? The immigration judge found that this was the only reason I have. That's very hard for me to understand, but the standard is one central reason. There could have been other reasons that were not legally central meeting that definition in the real ID act. And if that's the case, if the immigration judge was wrong to say there is only this one reason and that's it, but in fact there is a central reason and there is another reason that would be harmless error. Well, I don't know because only central reasons count under the real ID act to establish eligibility for asylum. You see my construct, only reason, legitimate government investigation. I don't see a single investigation case that is like this one because it's an illegitimate investigation. It involves torture, killing and forcing people to be spies. So the only reason credited isn't available reason under the law, at least if you look at it through the SP factors, and I'm going to look into what you said. On the other hand, what's the protected characteristic? Because if it wasn't for that reason, what was it for? It's got to be one of the three. The one that seems to me pretty obvious is if you kill every adult male in a family, it seems like it's pretty meaningful that you're trying to kill male family members. Well, again, I would just come back to the fact that these are two different factual scenarios and we're not clear on when he knew what about the uncle and the grandfather. With regard to matter. What's the law? What is a legitimate investigation? Does that go to the means of the excessive torture constitute a illegitimate investigation? I'm not sure, Your Honor. This is it's not a term of art. Well, matter of SP gets into this right there. The Amnesty International and the Department of State said, let's look at exactly how they investigated. And there they rounded people up and sure enough, one of them was convicted and they had due process. And therefore, we say that's reasonable investigation. For SP, we're talking about pretextual. Are we going after you because of some protected characteristic you have, but doing it in the guise of official dumb. But even when you look at SP, the first factor is indications that the abuse was directed toward modifying or punishing opinion rather than conduct. And we come back to the 10 months that nothing happened to the son. Yeah, that is the big fact. The government wasn't interested in him until he started selling things out of this particular store again. But in those 10 months, did he make inquiries about the grandfather and the uncle? I, I don't recall, Your Honor. That could be important because that would explain why they suddenly say, well, here's another male in the family we need to get rid of. Except that the government, not not the police, but the local authorities initially permitted him to reopen the store. And then it was the central police that said, oh no, you can't do that again either. Horrible facts. Let me ask you about the Singh case. My antenna always goes up when one side relies substantially on a particular case and then the other side in its responsive brief doesn't mention or read into that weakness. I understand that Singh is from another circuit, therefore it's not binding on us. But is it, is it wrongly decided in your view? Or if it were a binding decision, how would you deal with it? I think Singh goes a bit too far. I don't, I don't really see a way to reconcile it with Ozdemir, which is binding authority in the circuit. We have very clear statements that investigation of terrorism is not persecution. And this was, even if it was horribly done, an investigation. They asked him who other ONLF members were. They asked him if he was an ONLF member. They asked him to spy so that they could get more information. This, this was investigative, at least in part. And that's hard to even say. You're pausing is the way I think of it as a former prosecutor. It's hard to say this is an investigation if you're, if your choices are torture, killed, or spy. How do we call that investigation? I think we have a tendency sometimes in this country to assume that all other governments operate the way ours does. And unfortunately that's not always the case. There are many places in the world where this sort of activity is. Can you describe an investigative case where we, the courts searchingly look at other countries' approach and we say, there was due process. There was a trial here. This one was released. And that validates the investigation. Well, often the, I've handled cases, for example, from India where the police are, are very heavy handed. And often there is no trial that comes that people are just released. And that's how we often get to grants of protection under the torture convention without asylum. Do you have a circuit level decision that then says, for a legitimate investigation, we've looked at it. Anyone that involves, even one that involves torture, not killing, a published decision or a court decision. The legitimacy of the investigation with respect to the tactics is never condoned. But the term legitimate is always attached. But by, by legitimate, most of these courts, and I'm most familiar with the ninth circuit, by legitimate, they mean that they're actually looking into something that's real. It's not made up because they want to go after someone in particular. There was an actual crime committed and then we're going to beat someone up really badly. And here, there appears to at least be a reasonable basis to, to believe that the father was doing something that caused the government to go after him. I agree with that, but I just don't see the connection to the son. The, the son was operating the same store and they wanted information to know what he was doing. They asked him, are you, are you, I believe the phrase was gathering people like your father did. You know, he was a place where presumably members of the public came in and, and he had people available to him. We talked to him and yet he had some access to information that average guy on the street who didn't have contact with a large number of the public. I mean, wouldn't that be a, wouldn't that be a reason to, to, that's a friendly question. Wouldn't that be a reason to investigate? You, you don't go investigate a guy who's a, who's a hermit somewhere. You go ask somebody who has a lot of contact with the public. I don't think so, Your Honor. And I, I would think that the Ethiopian government, like all governments, has limited resources and has to prioritize and, and probably would not intentionally go after dead leads. If I could, I'm down to about two minutes left. I just wanted to touch on the underlying issue. This is also a matter of JBN and SM. The petitioner has essentially conceded that his ethnicity was an underlying reason. And the board has defined incidental and subordinate reasons to be not central reasons. They may be other reasons. They're not central reasons that reach the threshold necessary for asylum. And of course, as we've discussed, the court accords Chevron deference to the board's published decisions. And so there, to the extent that ethnicity was, was a reason at all, the petitioners have, have essentially told us that it was underlying and therefore can't form the basis for an asylum grant. What's your thought about the NRA redacted comparison? The, the, the redacted, the one where the BIA came out the opposite way. Oh, in the 28J letter. Yeah. Your Honor, I think that is pretty clearly factually different. In the unpublished decision, all there was to go on was the ethnicity. There wasn't any other contention between the parties. Something was happening there. And it was reasonable for the board to come to that conclusion in the unpublished case. The question now is whether it was, there's so little evidence that the court can uphold the IJ and the board's decision in this case on materially different facts. Okay. Thank you very much, sir. Thank you, Your Honor. Mr. Chau, back to you. Thank you, Your Honor. It's just a couple of brief points. I believe, Judge Davis, you asked about the REAL-ID, the interaction there. If you actually look at page 15 of our reply brief, we actually addressed this issue. The BIA has already said that the REAL-ID Act did not abrogate its standard for mixed motive cases like a matter of SP. That's page 214 and the matter of JBN case. Essentially, what was going on there, what the BIA thinks was happening with the REAL-ID Act was actually going after judicial decisions, not necessarily their own matter of SP factors. Second point, I believe Your Honor also asked if there's any definition of what makes an investigation illegitimate. Counsel's right. There's been no bright line distinction made. But the matter of SP rules factors do kind of go to that. In particular, I want to focus on the third matter of SP factor, which is conformity to procedures for criminal prosecution or military law, including developing international norms regarding the law of war. This is essentially where you do see whether things, what a government is doing is legitimate or not. And in this case, torture, I don't think even the government can see, is not a legitimate means of investigation, even if they think that the initial suspicion was legitimate. I don't think they can. I think they can see that the methods were deplorable. I want to talk briefly about his argument on how we use the term underlying. Therefore, we concede it can't be a central motivation. This isn't a magic words test. We use underlying to be descriptive. At the end of the day, it is about what motivated the persecutor to engage in persecution. The reason we use underlying is because it is what was undergirding. It was what was forming the basis for their suspicion of being an ONLF member. If anything, we would say that the underlying motivation for something is the stronger motivation. It's why you do something. In this case, it's why the soldier suspected him of being a supporter of the ONLF. Finally, on the 28J, I believe counsel distinguished the unpublished BIA decision on the grounds that in that case, there was no other potential reason to suspect he was a member or supporter of the ONLF, whereas in this case there was. That actually wasn't the basis for the BIA decision. If anything, you can argue that case actually had a somewhat stronger motivation. He had a cousin that he was close to that was supporting the ONLF. The BIA in that case did not focus on family members or anything like that. They went straight to imputed political opinion, similar to the Singh decision. What they said there was, in this case, he was falsely accused of being a member of the ONLF, and that was persecution on the basis of imputed political opinion. To take Judge Smith, your question on how the case is not quite binding on this court, because it obviously isn't, but I think the decision in Singh is actually not a departure from established principles of statutory interpretation. In this case, in Singh, the question is, what motivated the persecutors to do what they did? Your brief says it's indistinguishable. Yes, Your Honor. We think it's indistinguishable for this reason. When a government goes after a separatist group, a group whose sole purpose is to essentially stand opposed to the government, the Ninth Circuit correctly recognized that the reason for that persecution is because of their political opinion. And that's really just applying existing asylum law. And I actually don't think it conflicts with Ozdemir at all, because in Ozdemir, again, you had the explicit factual finding by the IJ that a protected ground was not the reason for the investigation. That's not in existence here at all. If there are no further questions, Your Honors, we think the petition should be granted and the petitioner should be eligible for asylum. Okay. Thank you, gentlemen. Thank you for your argument. Finishes the docket for the morning and we'll be in recess until nine o'clock tomorrow morning.